# Exhibit 1

*Sent via e-mail*

David R. Jimenez, Esq.
*Counsel to the DAWSON companies*
David.Jimenez@jacksonlewis.com

Allen K. Hoe, Esq.
Chairman, Hawaiian Native Corporation
ahoe@hnc.org

Dear Messrs. Jimenez and Hoe,

The U.S. Small Business Administration (SBA) is considering steps to suspend or terminate the Hawaiian Native Corporation's (HNC) participation in the 8(a) Business Development (BD) program. I am collecting information to determine whether good cause exists to initiate suspension and/or termination proceedings against 8(a) Participants owned by HNC under sections 124.303 and 124.305 of Title 13 of the Code of Federal Regulations. This letter notifies you that I am considering suspension and termination and allows you the opportunity to submit a response for my consideration as SBA's Associate Administrator for Business Development.

This termination inquiry is based upon information and evidence indicating that HNC does not qualify as a Native Hawaiian Organization (NHO). According to the Small Business Act and SBA's implementing regulations, an NHO is defined in part as an organization whose business activities will principally benefit Native Hawaiians. 15 U.S.C. § 637(a)(15)(C); 13 C.F.R. §§ 124.3 and 124.110(c). Thus, the clear legislative purpose of NHO participation in the 8(a) BD program is that revenues derived from the program are used to benefit the underserved Native Hawaiian community. To this end, applicable SBA regulations provide the following with respect to an NHO seeking to apply to and remain eligible for the 8(a) BD program:

> An NHO should describe any activities that it has done to benefit Native Hawaiians at the time its NHO-owned firm applies to the 8(a) BD program. In addition, the NHO must include statements in its bylaws or operating agreements identifying the benefits Native Hawaiians will receive from the NHO. The NHO must have a detailed plan that shows how revenue earned by the NHO will principally benefit Native Hawaiians. As part of an annual review conducted for an NHO-owned Participant, SBA will review how the NHO is fulfilling its obligation to principally benefit Native Hawaiians.

13 C.F.R. § 124.110(c)(2). Additionally, each 8(a) Participant owned by an NHO must annually submit to SBA information showing how the NHO has provided benefits to the underserved

Native Hawaiian community it serves due to the NHO's participation in the 8(a) BD program. 13 C.F.R. § 124.604.

Notwithstanding these requirements, it appears that HNC's business activities have not principally benefitted the Native Hawaiian community; rather, it appears that principals of HNC and its subsidiaries (collectively, the DAWSON companies[1]) have used HNC's and the DAWSON companies' participation in the 8(a) BD program to unduly enrich themselves at the expense of the Native Hawaiian community they pledged to serve. The documentary evidence supporting these allegations is extensive, consisting of:

**Attachment 1**: HNC budget figures for 2019, showing that HNC:

- Paid $946,500 in salary wages to Christopher Dawson – HNC's founder, former Chairman, and former CEO of the DAWSON companies;
- Earmarked $722,000, $868,000, and $740,000 to reimburse Mr. Dawson's credit card expenses in 2017, 2018, and 2019, respectively;
- Designated Dawson Group, Inc. DBA Hawaii Polo Life – a polo culture and lifestyle company owned by Mr. Dawson – as a subcontractor to HNC to receive ongoing payments of $25,000 per month;
- Allocated substantial funds to cover what appear to be personal expenses of HNC employees and board members, including: memberships to private social clubs, luxury car lease payments, lease or mortgage payments for personal residences, and personal travel;

**Attachment 2**: An HNC document entitled "[Christopher Dawson] Financial Audit Flowchart," showing what appears to be substantial salary and fringe benefit wages paid to Mr. Dawson, $500,000 in reimbursement for Mr. Dawson's credit card expenses, and $2.43 million in payments to support Mr. Dawson's lifestyle and hobbies, including (but not limited to) his polo activities and Anuenue Farms Hawaii – a polo horse farm owned and managed by Mr. Dawson; **check**

**Attachment 3**: Credit card statements for 8(a) graduate, Dawson Technical, Inc., showing that Christopher Dawson and others used company credit cards to fund their lavish lifestyles filled with Porsche rentals, stays at extravagant hotels, private jet rentals, an opulent trip to Dubai, tickets to see classic rock bands in concert, and fine dining, to name a few;

**Attachment 4**: HNC financial statements and consolidated tax returns purportedly showing that the DAWSON companies were transferring funds to HNC for the benefit of Mr. Dawson

---

[1] For purposes of this inquiry and document request, this term shall refer to any for-profit entity in which HNC holds or held a majority ownership interest at any time during the period covering January 1, 2012 – the present day. This includes HNC subsidiaries that have graduated from or otherwise left the 8(a) BD program, as well as those that have never been admitted to the 8(a) BD program.

and/or other principals of HNC and the DAWSON companies, falsely designating them as loans and subsequently writing them off as bad debts; - **not going to address because they won't agree**

**Attachment 5**: Internal accounting and transfer documents showing that HNC and the DAWSON companies transferred over $1.6M to Anuenue Farms Hawaii – a polo horse farm owned and managed by Mr. Dawson – between the period of August 20, 2015, and May 7, 2020, often designating these payments as subcontract payments for professional services such as marketing and branding;  - **check**

**Attachment 6**: An invoice for labor and equipment to set up a home theater at Mr. Dawson's Denver condo, along with a corresponding payment for the same amount issued by HNC subsidiary, Aktarius, coded as subcontract labor; and – **check!**

**Attachment 7**: An April 2, 2020, $400,000 intercompany transfer from HNC subsidiary, Dawson Solutions, to Dawson Group, Inc. DBA Hawaii Polo Life. **- check**

You will both receive a link to these Attachments by separate cover.

I find this evidence to be extremely concerning. According to the above-referenced documents, Mr. Dawson appears to have transferred (or caused the transfer of) over $2M of HNC's and the DAWSON companies' funds to entities he owns for his personal benefit over a five-year period between 2015 and 2020. Mr. Dawson also appears to have received millions of dollars from HNC and the DAWSON companies to reimburse his personal expenses during this same time. To put this into perspective, the collective value of cash benefits extended to Mr. Dawson during this five-year period far exceeds HNC's self-reported total cash contributions to support the Native Hawaiian community over the ***ten-year*** period covering 2012 – 2022, and this does not even take into account his exorbitant annual salaries during this timeframe. I am also concerned by what appears to be a practice of HNC board members, employees, and affiliated principals using HNC funds to cover personal expenses that are unrelated to the organization's purpose or business activities. The above allegations, if true, are the antithesis of the NHO program's intent and constitute a gross breach of trust. Perhaps most troubling is my fear that these documents only reveal the proverbial tip of the iceberg of undue personal enrichment within HNC and the DAWSON companies.

I recognize that HNC has done much to support the NHO program and the underserved Native Hawaiian community over the last 20 years. The evidence in my possession, however, ostensibly demonstrates that it had the opportunity to do much more; instead, Mr. Dawson and others within HNC exploited the significant NHO contracting benefits of the 8(a) BD program to personally benefit themselves to the detriment of the Native Hawaiian community and other Participants in the 8(a) BD program.

Additionally, I am aware of several senior management changes within HNC and the DAWSON companies, including: Mr. Dawson's removal as HNC Chairman and CEO of the DAWSON companies; Beadie Dawson's resignation from the HNC Board; Andy Winer's election to the HNC Board; Allen Hoe's selection as HNC Chairman; and Dave Johnson's promotion to CEO of the DAWSON companies. While I believe Mr. Dawson's removal from HNC and the DAWSON companies is an important first step to resolving many of the concerns outlined above, I am also troubled by what appears to be a lack of internal controls, oversight, and personal accountability at senior management levels that should have prevented this abuse from occurring in the first place. To be blunt, Messrs. Jimenez and Hoe, the documentation in SBA's possession appears to show that HNC's and the DAWSON companies' current officers and executives – some of whom are either immediate family members or close, personal friends with Mr. Dawson – knew or should have known of this pattern of undue personal enrichment within HNC and the DAWSON companies, and perhaps may have even participated in it.

Based on the foregoing, I am requesting that you show cause as to why SBA should not initiate proceedings to suspend and terminate the DAWSON companies from the 8(a) BD program based upon a determination that HNC does not qualify as an NHO within the meaning of SBA's regulations. HNC's response should address the allegations and supporting documentary evidence referenced in this letter. In addition, I am specifically requesting that HNC provide the following information and documentation:

1. A record of all payments made by HNC and the DAWSON companies for the benefit of Mr. Dawson, HNC's other Board members, and officers from January 1, 2012, to the present day, to include salary wages, bonuses, distributions, withdrawals, subcontracts, loans, reimbursement for expenses, and investments on his behalf. This shall include payments made directly to Mr. Dawson, entities owned or controlled by him, as well as payments to other individuals or entities for his benefit. Please break out such payments by individual and, where available, provide supporting documentation;

2. Credit card statements for all accounts issued to HNC and the DAWSON companies for the billing periods covering January 1, 2012, to the present day;

3. Audited financial statements and tax returns for HNC for the completed fiscal year periods covering 2012 through the present day;

4. Copies of HNC's budgets for 2012 – 2024;

5. Total compensation package values for HNC's officers and Board members, the DAWSON companies' executives and officers, and each operating subsidiary's general manager;

6. Copies of all agreements between HNC and its subcontractors during the period of January 1, 2012 – present day, and a description of services provided to HNC under each agreement (if not already included in the terms of the agreement). This includes, but is not limited to: Dawson Group, Inc. DBA Hawaii Polo Life, Thunderbird, Dorian Wright, Andy Winer, and Mr. Hoe;

7. An explanation as to how HNC's Directors and the DAWSON companies' officers and executives possess the good character and business integrity required for 8(a) BD program participation;

8. An explanation of any measures HNC and the DAWSON companies have taken to recover improper or excessive payments made for the benefit of Mr. Dawson, HNC Board members, its officers, or its subcontractors;

9. Estimated or actual gross receipts derived from the DAWSON companies during the period of January 1, 2023 – December 31, 2023, disaggregated by 8(a) and non-8(a) revenues; and

10. HNC's cash contributions to support the underserved Native Hawaiian community during the period of January 1, 2023 – December 31, 2023, disaggregated by program or organization.

As an alternative to suspension and/or termination, I may consider whether an administrative agreement could adequately resolve the concerns outlined above. In addition to the items identified above, please include in your response a description of the steps HNC and the DAWSON companies have already taken and/or are willing to take to ensure compliance with SBA rules and policies governing NHO participation in the 8(a) BD program.

Please submit your response by e-mail to oceactions@sba.gov no later than February 29, 2024. To the extent your response exceeds our server's 5MB limit, please let me know and I will establish a secure document request. I will carefully consider your response and any supporting documentation you submit before determining whether it is necessary to initiate suspension and/or termination proceedings against HNC's 8(a) Participants.

Thank you for your assistance and please let me know if you have any questions.

Sincerely,


Dr. Donna L. Peebles

Associate Administrator
Office of Business Development